All right, we're ready to hear argument in our third case of the day. Rise for Animals v. Washington Thank you. Good morning, Your Honors, and may it please the Court. My name is James Roselius, and I represent Plaintiffs' and Appellants' Rise for Animals and Animal Legal Defense Fund. Briefly, this case concerns a challenge to a USDA policy that was adopted in secret after the agency abandoned formal rulemaking. And the policy sharply limits what inspectors are allowed to inspect at certain animal research facilities. By adopting the policy, the USDA cuts off the very information in inspection reports, that is, recorded violations, that Congress requires it to make public under the Animal Welfare Act. And as a result, Rise and the public cannot fully know whether these facilities are providing humane care and treatment to animals or what it is even that USDA is inspecting. And where in particular in the statute is it that entitles Rise for Animals to the information that you seek? Section 2146A, Your Honor, entitles plaintiffs to inspection reports. Pardon? Entitles plaintiffs to what? Inspection reports, including all reports documenting all violations observed by USDA officials and all inventories. Congress did not leave it to USDA to define inspection reports. That is tied to 2146, which defines the scope of inspections. And Aikens really is the key here. This case falls squarely under Aikens. And the key in Aikens is that the court did not ask whether disclosure obligations were sufficient in the abstract. It first assumed for standing purposes that plaintiff's view of the law was correct, and then asked do required disclosures flow from that view. So applying that logic here, if plaintiffs are correct under 2146 that more complete inspections are required, then they are entitled to the additional information in inspection reports that flow from that view under 2146A. 2146A is pretty broad. Where is the specific language that you want to direct me to? The language in 2146A requires APHIS, that is the Animal and Plant Health Inspection Service, to make publicly available the following records. And under B1 requires all inspection reports, including all reports documenting all violations and noncompliances observed by USDA officials and inventories. So you can't know what an inspection report is without first knowing what an inspection is. And 2146 defines inspections, at least the scope of inspections, to be sufficiently broad to cover all deficiencies or deviations from the AWA standards. So looking at 2146... I mean, counsel, if that's right, if that argument is right, that the statute talks about discerning all violations, and there was a policy that says we're kind of shorthanded, you've got to look at all three components, but in order to get everything done, we can only do it, you get two hours. There's obviously some constraints in the ability to determine every imaginable violation, be they time, be they manpower, be they just the errors in the process. And it seems like your argument would say anything that doesn't guarantee that if there is a violation it's discovered would also violate an informational right. And that just seems... I know that's not what you're arguing, but it seems like that's the extension of your argument to me. Yeah, I don't think plaintiff's claim is that broad as far as the language of 2146. I don't think it requires perfect inspections. But you're saying that the reason you have an informational challenge is because the statute's... the inspection has to determine all inspections. And you've pointed out here one way it might not do that is going to one of the three designated components of an inspection. But that argument, I don't see how it wouldn't... you may not want it to be that broad, I understand that, but it seems like the logic of that argument would mean that anything that didn't do that would be in the same way entitling you to stand. Congress set a statutory floor, which I don't think is impossible for the USDA to meet. It simply is saying that the scope of inspections must be sufficiently broad to theoretically capture all types of noncompliances. It must encompass all the provisions of the AWA. Okay, that's a pragmatic approach. It's not a perfectionistic approach. The language itself says that follow-up inspections must continue until all deficiencies or deviations are corrected. That doesn't imply perfection. It implies that the initial inspection must be sufficient in scope to allow the agency to identify all deficiencies or deviations. Otherwise, that would be unworkable. And that interpretation is bolstered by other provisions of the Animal Welfare Act. 2143 requires research facilities to show upon inspections that they are complying with the provisions of the Animal Welfare Act. And USDA's own guidance says that prior to the policy, its view was that focus inspections did not count towards the annual inspection requirement. So the shift to say they now do count towards what is required in 2146 is incompatible with the language of the statute and Congress's intent in amending this section to add a specific requirement for annual inspections that lead to correcting all deviations. But aren't you counseled? I hear you there, and you may or may not have a good argument that this method of inspection is incompatible with certain provisions of the Act. But what we have to look at and what the district court found is whether that's true or not, you only get to bring a case if you have standing. And you pretty much, I know you have organizational, but I think it's pretty much informational standing when you read your complaint. And that means you have to have a statutory entitlement to the information. And you're not arguing, are you, there's any inspection reports that were issued that you didn't have access to, right? That's correct, Your Honor. So you're just saying they weren't good enough. You're not saying you didn't get them. Well, we have to know what an inspection report is. Because any document that is titled inspection report doesn't necessarily comply with the disclosure obligations. If it's a blank document with a blank inventory, that would not comply with what Congress intended. So what is it you want the agency to do for you, for your organization? What the agency must do, according to the statute, is to conduct complete inspections in the scope that would be sufficient to identify all sorts of noncompliances. What they're actually doing is looking at one-third of noncompliances by looking at only one out of three potential types of noncompliance in their annual inspection. And that doesn't meet the statutory floor that Congress set up in 2146. So in 2146A, it requires the results of the inspections to be disclosed to the public. And USDA says there could be no informational injury because they're giving us, as Your Honor said, the information that we're entitled to. They're giving us things that are called inspection reports. But that's the wrong frame under Aikens, because under Aikens, the court must first assume plaintiff's view of the law is correct and then ask whether they're meeting the disclosure requirements. What's your view of the harm in adverse effect? How do you show that in this situation? Your Honor, under this court's view at Laufer, being deprived of information under the statute is itself a concrete harm. The statute entitles plaintiffs to information, and being deprived of that information is a harm according to what Congress has set out. So that's your argument, that because you didn't get the information, is there anything else? Well, yes, Your Honor. Plaintiffs do not have to show additional harm, but they are animal protection organizations who use and rely on the information in inspection reports. And they've alleged that they are denied information that helps their advocacy to oversee the USDA enforcement, to monitor these facilities' compliance, to let the public know what is going on through their databases they collect. And they are unable to do that because of what USDA is doing in severely limiting the information that is available to the public through these inspection reports under its policy. It just seems like with the Alliance for Hippocratic Medicine that the Supreme Court is telling us there needs to be some real impairment, almost in the sense of like they analogize receiving a defective product. And I appreciate your first argument that information is enough. I understand that. But if we think the recent Supreme Court decisions are requiring more than that, I'm trying to see how you fit into that. I don't read the FDA decision as limiting informational standing. It was touching on a specific kind of organizational standing that plaintiffs do not put forward. So you don't think that's relevant to our consideration? No, I think it favorably cited Aikens, and Aikens is the standard under this court's decision in Laufer. But regardless, appellants have no problem meeting the harm requirement based on what they have alleged in the complaint and in their declarations they put forward. I also just want to point out in 2446A, USDA is not providing even what this provision requires on its face. They are not giving us documents or, of course, documenting all violations observed by USDA officials. If they're only looking at one-third of potential noncompliances, say they're looking at animals and they observe in the facility there are feces in the corner, they would not be reporting that in the inspection report because it does not fall within the narrow focus area of the inspection. And likewise with inventories, they're not providing us with inventories every year because they're not looking at animals every year. So either way you cut it, the policy is falling far short of what the disclosure requirement in 2146A requires them to do. So because the policy directly limits the creation of information that appellants are entitled to and setting aside the policy would restore that flow of information, that is enough to find informational injury under Aikens as well as redressability and causation. I'd like to turn to final agency action with my remaining time. There is no dispute on the first prong of the Bennett v. Speer test. On the second prong, there are actually several legal consequences that flow from the action in question. And these affect both the agency and the facilities that it regulates. The policy binds inspectors to a mandatory policy. It mandates that they change focus areas every year, and it even alters the inspector's view of the law. Prior to the policy, they could take the position that focus inspections did not count towards the annual inspection requirements. Now their discretion is withdrawn. They must take the view that it does count towards that requirement. Well, it affects how they check for compliance with the statute, but it doesn't change any of the statutory requirements, correct? That is correct, and that's not what is required under Bennett's second prong. What's required is that it changes the legal regime, and one of the ways that it can do that is by changing the expectations of enforcement for the regulated entities or their compliance behavior. The guidance even goes so far as to say they have worked hard to become accredited. They have a right to expect that inspectors will follow this guidance. So it is shaping their enforcement expectations and is limiting their potential liability. They are now responsible for only one-third of potential noncompliances, and that gives them a kind of safe harbor with respect to the other two-thirds of noncompliances under the Animal Welfare Act. And under the pragmatic approach espoused by the Supreme Court in Hawks, those are legal consequences that meet Bennett v. Spears' second prong. And the fact that they went through formal rulemaking on a substantially similar policy shows that they are thinking about this in terms of its legal effect. Finally, this is not a challenge to a failure to act on the agency's part. It is not a broad programmatic challenge. We are challenging a specific, discreet directive to agency staff. Counsel, can I ask you to clarify when Judge Thacker asked you what you want the agency to do, you said, well, we want them to get out there and do full inspections. That makes it sound like you are trying to get into the day-to-day work of the agency. So even more specifically, what do you want the district court to do? Let me be more specific. We want the district court to set aside the unlawful policy. We're not asking for anything more than that. We're not asking for anything that requires any more judicial oversight than simply setting aside an unlawful policy. Thank you, Judge. And because of that, we fit within the second prong of Bennett v. Spears and can show final agency action. And so I'll just say that this policy erects barriers precisely where Congress intended there to be transparency and oversight. And beyond the general informational harm, it affects appellants by limiting the information they need to do their advocacy work by removing information about whether animals are provided humane care and treatment under the Animal Welfare Act. And that changes the legal regime for the agency and for the facilities that it regulates and for the animals that the statute is meant to protect. So for those reasons, we respectfully ask the court to reverse the district court and to remand on the merits of plaintiff's claims. Thank you. All right. Thank you. Mr. Springer. Thank you, Your Honors, and may it please the court. Brian Springer on behalf of the federal government. I'd just like to take a step back and talk about the nature of plaintiff's claim here. At its core, plaintiff's lawsuit is an attempt to enforce a statutory provision that has nothing to say about the disclosure of information. Plaintiff's claim that the agency is required to conduct more comprehensive inspections of research facilities regulated under the Animal Welfare Act. Plaintiffs are not research facilities that house or handle animals, and they aren't subject to those inspections. But plaintiffs claim that they're allowed to challenge the adequacy of the agency's inspections because Congress has included a separate statutory responsibility for the agency to release to the public the inspection reports that the agency creates. I don't think that there's any case, I'm not aware of any case, in which a plaintiff was able to leverage the fact that there's a disclosure provision to challenge a separate substantive obligation that they don't otherwise have the ability to challenge, and that's what plaintiffs are trying to do here. Aikens is pretty close, right? Isn't Aikens more or less that fact pattern? Your Honor, I don't think that that's right. I mean, Aikens was specifically about an extensive record-keeping and disclosure set of requirements, and there the dispute in the case was about whether an organization qualified as a political committee that then was subject to those disclosure requirements. And also other rules, like being a political committee was going to subject them to a lot of requirements, not just disclosure. It's not all about disclosure. That's true, Your Honor, but it was the case that what the plaintiffs in there were seeking was a specific set of information, namely information. But that seems, I guess, let me ask you this. What if the agency here had, instead of doing the partial inspection policy, had just said, look, if you're a facility certified by a credible third party, you don't qualify as a research facility anymore subject to 2146? So no need to inspect, no inspection reports. That would be Aikens, right? Your Honor, I guess I still don't think that would be Aikens. I mean, here we're talking about two separate responsibilities that are set out in different subsections. If it were one section, what if it were one run-on section, and it just says something like the secretary should inspect every facility at least once a year, look at the facilities, the animals, and the records, and then write a report and give it to the public? One run-on sentence. Your Honor, I don't think that would make a difference. That would be the same thing as what happened in the D.C. Circuit case Jewell. There, in one single sentence, there was both a deadline provision or a deadline requirement and then a disclosure requirement, and the court separated out the two and said, even if you're alleging that there was some noncompliance with the deadline requirement that would lead to the disclosure requirement being triggered, you still have to separate those out, and you have to be trying to enforce just the disclosure requirement. Here, plaintiffs, you know, I think have admitted today that the agency is releasing the inspection reports that it's supposed to be releasing, so it's complying with its obligations under 2146A, but what they're trying to do is they're trying to use the fact that that has been tacked on to challenge the substance of the inspections themselves, the way that the agency actually runs its inspections, which is an entirely separate requirement, and here it's underscored by the fact that it's actually set out in a different subsection, namely 2146, and I know it's a little confusing. It's 2146 subsection A versus 2146A. Your Honors, I'm happy to address any other questions that Your Honors may have. I do have a question. I'm just trying to make sure I kind of understand the outline of the arguments here. So you're making, even if, am I hypothetical, even if you're not arguing that you can't read 2146 parentheses A to require what the plaintiffs are calling a full inspection, that each year you inspect the facilities, the animals, and the records. Even if it said that, just straight out, you would still be here saying, well, but that's a different provision. That's correct, Your Honor. I mean, obviously the agency doesn't think that's the right way to read 2146. But that's not like the premise of your argument. That's correct, Your Honor. You can give that up. Correct, Your Honor. Even if you accept everything that the plaintiffs are saying about the right way to read 2146 subsection A, it would still be the case that they don't have information outstanding. That's extremely helpful. Thank you. Counsel, on the harm and adverse effect issue, I'd asked your colleague about that, and he pointed to the Walford case. How do we, what's your way, we have Dreher, we have Walford, then we have the recent Alliance case. What's your understanding of what has to be shown in the way of harm? Is just the absence of information enough? Because I do think Walford, that's a fair reading of that case. Now, it's a unique case maybe as a tester case, so maybe we've got a rule for testers, but we've got to deal with that. And so how do we look at those three cases and tell us what we're supposed to do there? So, Your Honor, we haven't taken a specific position on this question in this case because the district court didn't reach it. Well, I'm asking you to take a position as best you can because I might want to reach it. So, Your Honor, the D.C. Circuit has said that there's sort of two separate requirements. It has said that there's a requirement that you show that Congress has said, you know, by statute that the agency has to produce the particular information at issue, and that's really what the district court went off on here. Right. But the D.C. Circuit has also said, reading Supreme Court cases, that there's a separate requirement that you show that there's some harm that flows from that. Doesn't Dreher suggest that too? And that's correct, Your Honor. This Court's decision in Dreher suggests that as well. There does seem to be sort of a little bit of, you know, potentially tension in this Court's cases on that front as to exactly what showing that needs to be. Right. I do think the Supreme Court's cases, particularly the more recent alliance for Hippocratic Medicine, suggests that there has to be something more. You know, there has to be an actual harm that flows. And here all plaintiffs are pointing to is just the alleged denial of information. Well, a second ago when I asked, they said, no, no, no. We're an organization, and this impairs our ability to do what we do. Is that, if there is some harm, is that enough? Your Honor, just the kind of abstract impairment of the mission is exactly what alliance for Hippocratic Medicine said doesn't count. They said you can't just divert resources and say that, you know, that sort of internal moving around of money. I think they're saying more than just resources. Maybe I've misunderstood them, but it sounded like they're saying from an effectiveness standpoint, we can't do what we do, which, you know, may be a Haven's Realty type claim, maybe not. But I think they said more than just it's, you know, affecting our resources. Your Honor, I think here the allegations really were about the diversion of resources. I mean, even if you took them to be saying something broader, again, alliance for Hippocratic Medicine specifically addresses this idea and says sort of, you know, a harm to your abstract mission and sort of the way in general you're kind of approaching something is not enough. I mean, it specifically talked about Havens and limited Havens to a situation where there was a very concrete effect on the way that that organization was doing business. It wasn't just sort of an abstract, you know, this is her mission. It seems pretty much like Havens is as far as this could possibly go, unless you're on far with Havens, you're going to have a hard time on this issue. Do you agree with that? I agree with that, Your Honor, and I think here the plaintiffs themselves have abandoned the theory of organizational standing that they now seem to be, you know, to some extent talking about today. But that harm is an element of informational standing, right? I know to the extent we find it in DREER in an informational context, right? Your Honor, I think DREER suggested that there is that extra harm requirement and that also flows from D.C. Circuit cases as well as the Supreme Court cases. But how are they not harmed? I mean, again, I don't understand them to be making, or I don't understand the plaintiffs to be making a diversion of resources argument. I mean, this is their thing, their animal rights groups. It used to be that every year the inspectors had to come in and inspect the animals, not just the facilities or not either or facilities, records, or animals. So theoretically now, by hypothesis, they're only looking at the animals once every three years. This is their whole thing. It's what they do. They want these reports about the condition of the animals, and now they're not getting them. I don't, like it's not like there's some competing facility that has an economic, you know, wants to make sure the inspections get done against a competitor. I mean, they have a real need for this data about the animals, and that was exactly why Congress passed the statute, so that the animals would be inspected and the public could kind of keep everybody on their toes. This one seems, I mean, I don't really see the difficulty in identifying a harm in this case. And not only is there a harm, but it's the harm the statute was aimed at. So, Your Honor, I mean, I guess I think the thing that's important here is we're talking about sort of two separate, you know, again, to sort of return to the original point, we're talking about two separate statutory responsibilities. And the one that the plaintiffs, you know, are sort of trying to use is the one about releasing information to the world, which the agency is doing. It's conducting inspections. It's releasing the information to the world. And plaintiffs, I don't take to dispute that that's what's happening. I do understand your two provision argument, yes, or two different duties argument. Your Honor, and the reason I think that's important in response to your question is, you know, this whole statute is a scheme about protecting animals, providing humane care and treatment to animals at research facilities and when they're sold in an exhibition. That's what the whole kind of focus of the statute is. And then Congress tacked on this additional disclosure provision that says that when you do the inspection reports, you release them to the world. But that doesn't mean that sort of this whole thing turns into a, you know, a disclosure provision. This is all about protecting the animals.  But one of the ways Congress sought to protect the animals was by getting, you know, having, oh, I can't think of the phrase, but, you know, like what do they say in the key TAM context? Like private attorneys generals almost. You're going to have public disclosure so that members of the public can sort of be engaged in this process where if something is going wrong, there will be a public outcry. You know, I mean, it may, you know, we're not disputing the idea that it is true that Congress wanted these inspection reports to go out to the public. And so that provision is doing some work and is requiring the agency to release that information to the world. But usually, you know, when you're talking about standing, there has to be some sort of concrete effect on what, you know, to the plaintiff. You know, that's ordinary standing principles. And I think that what plaintiffs are trying to do here is sort of an end run around that. So it should be like this is the animals would have standing but not the people who protect the animals. Your Honor, I mean, these plaintiffs are sort of a step away from, you know, they're not the regulated entities. They're not the ones who are housing the animals and, you know, keeping the animals in their care. They're sort of one step away and saying because they get information from the agency, they should be able to reach back. Can't Congress have a provision that does, you know, require the availability and production of reports so that there is sunshine, there is the ability to have public outcry, you know, from a ‑‑ but that's not the same as standing to bring a lawsuit. I mean, aren't those different things that we do want to bring maybe some exposure and people can take actions and do all sorts of things. But there's a difference in doing that and coming to federal court and say you have standing. Is that right or is that wrong? Your Honor, I think that's correct. And that's why these informational cases in particular are sort of limited to enforcing the part that's about information and the part that's about releasing information to the world, not, you know, those don't sort of create a mechanism and open up challenges to everything that the agency is doing, which is what I think the plaintiffs are trying to do here. What's your position? I asked your colleague about the final action issue and in particular whether rights had been altered. And I think he agreed that there wasn't a change in the requirements about what facilities and people who were dealing with these animals must do, but he pointed out that there is a change in the expectations of the inspectors. Is that a change in legal rights and responsibilities under the law as you understand it? And what's your response to that? Your Honor, I don't think that it is. I don't think that that's enough. You know, usually what's happening in the cases that I think the other side is referring to, and particularly, for example, the Hawks decision, that was one where a position that the agency took actually affected the legal rights or obligations of the regulated parties themselves. So there it was a jurisdictional decision about what waters kind of came within regulation, and it would provide a potential safe harbor to the landowners themselves for a period of at least five years. So there, there was an actual determination of the legal rights and obligations of the regulated parties. If those waters weren't U.S. waters, they weren't subject to the regulations at all. That's correct, Your Honor. Whereas here, what we're talking about is we're talking about the way the agency checks for compliance to make sure that everybody's complying, but that doesn't actually change the underlying substantive standards that all of the regulated facilities must continue to comply with. So they might say, well, if you're only inspecting one of three categories, from a practical standpoint, the adherence to the, there's a less likely, there's a greater likelihood that there won't be compliance. If you're only checking one of three, maybe you don't run quite as tight of a ship. Or maybe, I know it's not like you go one, two, three, so you know there's not a prior knowledge of what the one's going to be the next year, but maybe practically they don't do as good of a job. Is that the way we look at this, or do we look at what the ultimate legal requirements are? Your Honor, I have two responses to that. I mean, one that's sort of legal and one that's sort of practical. So on the legal front, I think the way the cases talk about this is they're talking about legal rights and obligations. They're not talking about sort of as a practical matter how this shakes out in practice. And so I think here, again, the Hawks decision is a good example of something that was an actual kind of potential legal liability shield, not just a decision that was being made internally that may kind of in the real world play out in one way or another. But I guess I also just want to make sure that it's clear that in this case, the agency has devised a policy that it thinks is doing enough based on its limited resources to check for compliance. I mean, we're talking not about all of the facilities. We're talking about research facilities, and we're talking about a specific subset that the agency thinks are low risk, and in those circumstances on occasion it's only checking certain parts, but then other years it's doing a complete inspection, and that that should be enough to actually make sure that, you know, everybody is complying with their substantive obligations that aren't changed by how the agency is checking for compliance. So, Your Honors, if there are no further questions, we would ask that this court affirm. All right. Thank you.  And you have two minutes in revettal. Thank you. I would just like to respond to the argument that appellants are bootstrapping standing by finding two unrelated provisions and tying them together. When Congress adopted 2146A, it was aware of 2146 and intended them to be related. Under the government's position, they could institute a policy that instructs inspectors to close their eyes upon entering a facility, and that would be fine under the disclosure requirement because these are two distinct sections. I don't think that's what Congress intended when it adopted 2146A. This is just like Aikens where there is a legal determination that directly impacts the disclosure that is required by a disclosure provision. With respect to Judge Quattlebaum, your question about how Draher and Spokio or Draher and Laufer interact with one another, I think Draher and the Supreme Court cases, Spokio and TransUnion, they dealt with bare procedural harms where the harm was not the one intended by Congress in enacting the disclosure statute. And so some additional harm was required. Here, Congress adopted a disclosure mandate that essentially deputizes the public to oversee the USDA's enforcement regime. So depriving the public of information that they're entitled to is itself a harm under the Laufer and Aikens standard. And just quickly, the harm that appellants face here is not a Haven-style injury. It is that we do not have information about whether facilities are in compliance with the AWA, specifically the language referring to inventories and observed violations. USDA's policy makes it so that we do not have those inventories. We do not have those violations in our hands. Thank you. All right. Thank you. We'll come down and greet counsel and proceed to our last case.
judges: Stephanie D. Thacker, Pamela A. Harris, A. Marvin Quattlebaum Jr.